Thank you, Your Honor. My name is Bob Salk and I'm here for Sargento Foods. What I'd like to do is take eight of my first ten minutes in our claims, reserve two, and then respond to theirs with two minutes of rebuttal and ten minutes responding to their cross-claims, if that's okay with the Court. However you divide them is fine, I'll allow it. Sargento was appealing three decisions by the District Court, two on summary judgment and one on the CR-50 claim. And basically our position is what the Court did on summary judgment was weigh evidence, add provisions to the contract, and in the CR-50 case, the situation acknowledged that the appellee's theory of the case could not prevail and yet grant a judgment to the appellee, presumably on that very theory. For that reason, we request reversal of those decisions. First, under the agreement, paragraph 2.5a, there was a sale where Sargento bought portionables of the company. Portionables warranted, among other things, that there were no violations of law. There was no knowledge requirement. It's a pure statement of fact. In reality, and it may have been unknown to the people of the appellees, there was a violation of law. They hadn't been caught yet, but in fact, there was a violation of South Dakota law relating to the licensing of milk products. My understanding is that South Dakota changed its law so that what had been legal became illegal. That's not quite right. I mean, what happened was, Your Honor, that in the past, all milk product factories were 100% milk product factories. There was no rule of law interpretation that says milk products equal 100%. It would be as if you only caught speeders going 100 miles an hour. That doesn't mean someone going 70 isn't also speeding. South Dakota law says that the administrator, if he believes it is or she believes, it is necessary, can promulgate rules defining certain things. It didn't happen here. So to say the law changed is not correct. What happened was that when we came forward, as we were required to, seeking a license, we were told, yeah, even though you make 50% milk product, in other words it's 50% milk in your products, the law applies to you. So it wasn't a change. There was some uncertainty whether a license was required. There was uncertainty in this sense, Your Honor, and that is that up until that time there hadn't been a production facility in South Dakota producing milk products of less than 100%. And that was the definition of a milk product at that time, was it not? It was not, Your Honor. There was no definition of milk products saying it was 100%. In fact, it was applied that way because that's how all the factories were. South Dakota code did not define it as 100%. No, but didn't the regulation, wasn't there a regulation? I read somewhere that there was, I have to see where that came from, but I read somewhere that milk products were considered 100% dairy. I'll see where I found that. The South Dakota Codified Law 4032-18 reads, the Secretary of Agriculture may promulgate rules pursuant to Chapter 1 through 26, as may be needed to, determine the grades of milk, determine methods, define individual milk products and set standards for each. Yeah, but was there ever a regulation promulgated that said a license was required for dairy products that contained less than 100%? There was a regulation, which is South Dakota Code 4032-4, and if I may read it to you, at least the relevant section. Any person engaged in a production in the operation of a seeding station, or any person buying milk produced in South Dakota, or any person selling milk or milk products shall, before beginning business, obtain a license. So that doesn't tell you anything if you don't know what the definition of milk products is. Is it defined? No, Your Honor, it was not defined, and, of course, that is an issue. But to take exception there, if you're a yogurt plant, 100% milk product, if you add a blueberry to it, are you not licensed? And what South Dakota law did was provide discretion to the administrator to make those decisions. The fact that it hadn't come up before doesn't mean it wasn't the law at the time. And what the contract did was shift risk. Who was going to take the risk of these types of situations? We paid a lot of money, and what the deal was, you folks take the risk. That was a risk they took. And, unfortunately for everybody, I mean, we would have preferred that it didn't happen this way. The risk fell on them. Indeed, what the trial court did was not only, and this was on summary judgment, we had testimony from the person in South Dakota who was regulating who said, as of 2007, they were in violation. But also there was a representative from the South Dakota dairy, South Dakota Department of Agriculture that said the only time we would have any reason to be in the plant is if the yogurt product was 100% dairy. So there were conflicting signals from the agriculture department. At best. Fair enough. But, again, it's a risk allocation, and this was decided on summary judgment. The reason he said that is because all the plants in South Dakota at that time had been 100%, to my understanding, milk product plants. This was the first that wasn't. We came forward as we were required to, and, in fact, on summary judgment. Who said you were required to? In reading the record, it kind of appears to me that you orchestrated this licensing issue, because, you know, Sargento pressed the issue. I mean, the dairy, it's not like the Department of Agriculture came out and inspected and said you need a license. Sargento really kept asking, don't we need a license? Don't we need a license? Well, that's not quite right, and let me read the statute and let me address that. No, I'm talking about the record in this case. Yeah, and this is the record. The record is Sargento is a nationwide food processing company and is a good corporate citizen. The last thing it wants is to be in violation of public health laws. And so when it has a question, it raises it. It acted appropriately here. And, in fact, the statute says, and it was a statute they were following, any person selling milk or milk products shall, shall, before beginning business, obtain from the secretary a license. Let me ask you this. Sure. It's not a complete explanation as to why you went to the South Dakota authorities, that you just wanted to be good citizens. You must have had a business purpose. What was the business purpose? The business purpose is just that. No, no, there's more to it than that. Well, the U.S. Department of Agriculture came out already, saw violations, so we were concerned. And there is a business purpose with due respect, and that is the last thing this company needs is to be shut down. We had been licensed in other states. We had never run a plant in North Dakota before. So we were not familiar with. In North Dakota? I'm sorry, in North Dakota. I'm sorry, Your Honor. I thought it was South Dakota. I'm sorry, South Dakota. We had not run a plant in South Dakota. So we did not want to be in violation of law. That's why we went to them. So the Department of Agriculture came out beforehand? Is that what you're saying? The USDA had been out, but then we went to the authorities in South Dakota and notified them that we wanted a license. They came out, said to us, well, we're going to be out here anyways. Let's talk. Did the USDA say that you needed a license from the local? No, Your Honor. No. And the USDA issues are not relevant to this issue. I mean, to be fair, it's just that's how we were involved in the situation as it is. Is Carl Link one of Sargento's employees? Yes, sir. He sent a memo to other Sargento employees saying basically they confirmed, that's the South Dakota people, that there are several gaps in South Dakota and that the definition of dairy products associated required inspections was pretty much limited to basic fluid milk and ice cream products. However, they also stated that South Dakota was reviewing this and may expand the products and plants that it may require to be dairy inspected. Yes, Your Honor, Carl Link said that. What the authorities from South Dakota said was, and that was Mr. Kurtzenbach, was quite different. Mr. Link was not an employee of the Department of Agriculture there. Mr. Kurtzenbach was, who said they were in violation in 2007. We just didn't know it. And what Judge Heckman did was two things. She discounted Kurtzenbach for two reasons. She said, one, his testimony that the plant was in violation does not go to the knowledge of the appellee. Well, there was no knowledge requirement. Second, she said, it was mere speculation on his part because the original question was were they in violation. Asked by appellee, his deposition was, I guess they were. The follow-up question was, look, we don't want any guessing. Were they in violation or not? He said, I don't have the exact quote in front of me. Yes, there were violations there. She read that to be speculative. I think on summary judgment, that was an improper inference to draw. All inference have to go our way, not the other way. And then she added a knowledge requirement where one is not in the provision. I should say that the only knowledge requirement that they point to is in our apply brief, and it didn't apply here. What I'd like to do, and I'm happy to answer your questions, is quickly go to the capacity issue. And in that situation, again, the question before her is, what was the meaning of the phrase, the uses for which the plant was being put? They say, and we agree, it's a capacity question. Even under their theory, we win. Even under their theory, we win. Because the way these plants operate, they don't operate full capacity all the time. So when portionables produces 9 million pounds in a year, that means some days it's at zero, some days it's at full capacity, some days it's at half capacity. That's how these things run. Well, they have to go outside their own contract to say 9 million, that's what it meant. We pointed out in our brief, what if on the day of the closing, it was at zero? Would that mean, or one pound, that that's the standard? When they told us the plant had a capacity of 40 million pounds per year, we understood it never run 40 million a year. But we also understood it had that ability to do that rate. And in fact, had at least at certain points during the year. So you have to go outside the contract to determine when you slice that provision. That's their theory. Attendant to that is the idea that everyone knew the place was losing money. Everyone knew that. That's why we wanted to know what the capacity was, because we intended to make money with it. I think I'll go another minute and go on the retention issue if I may. And that is the signing and retention bonus question. Cagliari's theory was that retention meant a non-compete. Well, that didn't fly, and the judge said so. Because we had a non-compete from the stock purchase agreement, which was integrated by reference into the employment agreement. We said it meant you had to stay the full time. The judge said Cagliari's theory cannot prevail. This is after all the evidence was in, and still awarded judgment to him. In other words, she chose a meaning that neither party asserted. And I should say it, assuming she didn't choose his theory, because we don't know what meaning she put to it. Now, again, that's not to say that they don't have an argument on it. They do. There may be reasons that were wrong, but it's a question of fact that the jury had a right to decide, and it was taken from us. I'd like to reserve the remaining time if I may. Thank you, Counsel. May it please the Court, I'm Brad Fisher, co-counsel for Patrick Cagliari and the other former shareholders of Portionables. I'll be speaking to the issues raised on Sargento's appeal, and my co-counsel, Mr. Goldfarb, will be speaking to the issues in connection with the Cross appeals. Given that I am addressing all these issues, I have a lot of ground to cover. But thematically, the thread that runs through, really, this entire appeal is Sargento's effort to distort some verily carefully drafted, written, heavily negotiated agreements between sophisticated parties. First, I'd like to speak to this issue of the claim for the return of the signing bonus. When Sargento filed its counterclaim, the claim, and it's in the record, was that Mr. Cagliari had breached the employment agreement by resigning before the end of the term. That was the claim. And that the signing bonus, return of some portion of the signing bonus, was somehow damages for a breach of the employment agreement. Well, now Sargento says, no, resigning is not a breach. It's a possibility that is provided for in the employment agreement. They agree it's not a breach. There's nothing wrong with doing it. But what they say is that the parties actually agreed in the employment agreement that a portion of the signing bonus, or all of the signing bonus, I'm not sure what the theory is, would be returned if Mr. Cagliari resigned. But that's not what the agreement says. Section 7 of this agreement provides every possible scenario under which Mr. Cagliari might separate from his employment with Sargento. And they're very specific about what happens in each case. What's forfeited? What's prorated? Which bonuses are still earned? Which bonuses are not earned? You will not find anywhere within this employment agreement a suggestion that the signing bonus was to be returned or paid back in the event that Mr. Cagliari exercised what Sargento now agrees were his rights. If he had resigned the day after he signed it, could he keep the entire signing and retention bonus? He could, Your Honor. And there is more than ample consideration for the signing bonus. There are non-compete obligations in here. There are confidentiality obligations. There are invention obligations and the like. Of course, the way this contract is structured, the intent is that he's going to be running the business so that he and his colleagues can obtain the earn out, and he's also well compensated in terms of salary, and he has a bonus component that kicks in. So the signing bonus, saying, you're going to sign on to this contract and these obligations, that's not an incentive for him to stay. And fundamentally, Mr. Gentine was asked point blank, did you ever, ever discuss the notion that this signing bonus would have to be repaid or returned? And he answered no. This is simply, this subject was never discussed. It's not reflected in the agreement, and it's not consistent with Section 7. The production capacity claim that Sargento is making breach of warranty, Section 2.14 of the agreement, is a claim that in this stock purchase agreement that the shareholders gave a warranty that the South Dakota plant was capable of producing 40 million pounds of sauce a year. Of course, the starting point here is the language in the warranty itself, which says exactly what's being warranted. It says the equipment is structurally sound, that it's in good operating condition, it's adequate for the uses to which it's being put. The shareholders further warranted the equipment is reasonably sufficient for the continued conduct of portionables business in, quote, substantially the same manner as conducted prior to closing. They specifically said it's fit, it's in good shape, it's going to continue doing what it's been doing. That was the warranty here. I deposed a 30B6 designated company, and I went through this warranty claim in detail. And I asked him, what is it in here, where do you see something that says it's going to do more than 400%, the highest level of production that this plant has ever done? He said, it's not here. And I said, this is couched in the present tense, isn't that correct? He said, yeah, that's right. And I said, why are we here on this claim? And he said, I saw some sales projections during due diligence that suggested to us that this plant must be capable of making 40 million pounds because how could you sell it if you couldn't make it? So ultimately what this claim devolves into is a claim that Sargento claims to have relied on sales projections provided during due diligence outside of the stock purchase agreement. But Sargento agreed in this contract that they would not make this claim. 4.9 of the stock purchase agreement, the no reliance provision, again, very clear. Sargento promised it was not relying on anything except what is expressly set forth in Article 2, Section 9.9. The integration clause says everything the parties have promised and agreed to is here in this agreement. This equipment was as warranted. Sargento's projections are it can actually do 33.5 million pounds of sauce a year, even though it's never been close to that in actuality. This equipment was as warranted, and you simply cannot find a 40 million pound warranty in the stock purchase agreement. Now, the dairy law claim, the claim of the breach of 2.5A of the stock purchase agreement. Now, the claim here is that Portionables was allegedly currently in violation of South Dakota dairy law on April 30, 2007. That's the claim. That's what Sargento's required to prove in order to prosecute this warranty claim. There were no genuine issues of material fact. There are no genuine issues of material fact presented on this appeal, and the district court got it right in dismissing that claim. Are you saying it's a legal issue? I am, Your Honor. The issue of the speculation of Mr. Kurtenbach about whether a subsequently formulated definition of milk product could be applied retroactively, which I would submit, Your Honor, it doesn't even matter if it's applied retroactively because at the time of the sale there was no breach. Well, it depends on what the law was at the time of the sale. Well, that's right, Your Honor, and I think the court has recognized. I mean, there is abundant evidence here, including Mr. Kurtenbach's February 2008 email, that the standard was 100% dairy. That was the standard. He said, I have no reason to be in that plant unless it's 100% dairy. But what's important here is, I mean, there are three separate grounds for affirming. One is that the change in the meaning of milk products, and to be sure it was a change, took place in the summer of 2008. You said to be sure. Why are you sure it was a change? Well, because Mr. Kurtenbach, who'd been with the department since 1989, testified that they had consistently interpreted this provision, that they only regulated plants that were 100% dairy, that those were considered to be milk products, and they did not consider their jurisdiction to extend beyond that. And they spent a period of five, six months coming up with a new definition of milk product, and that happened in 2008. And there is no debate here that that is a rule under South Dakota law. 126.1 subpart 8, an agency interpretation of the law of general applicability, is a rule. That constitutes rulemaking by law in South Dakota. So the issue then becomes, can you take a rule, and they don't even address 126.1 in any of their briefing, can you take a rule, which is created a year after the sale, improperly, by the way, not in conformity with the South Dakota APA, can you take a rule from 2008 and retroactively apply it to establish that there was a current violation as of April 30, 2007? And it simply can't be done. And we've also pointed out that under South Dakota law, there are specific requirements if an agency believes it's appropriate to retroactively apply a new rule, they've got to make a special showing that it's appropriate for whatever reason. And again here, the record establishes they didn't follow the APA, and it's devoid of any evidence that there's any justification at this point for going back and applying this retroactively to a prior period. And the court's absolutely right. I mean, Sargento sought this out, and they pressed it, and they pressed it, and in fact, South Dakota thought they were doing them a favor. I mean, that was what the regulators thought, because they would then be able to get a certificate and export product. Yeah. So this was Sargento's issue, which spills over into operational control, which I'll turn to my colleague here momentarily. I'll skip the discussion of knowledge of a change in regulatory conditions. I don't think anyone was focused on that part of 2.5A in the district court. The record was very clear factually about what happened, when, what the chronology of events was. But even here, it's a third basis to affirm here. The dismissal of the dairy law claim is that portionables had no knowledge. South Dakota itself had no knowledge that the law was going to change, and that the violation that's alleged here is the product of a change in regulatory conditions. As a result, even if there was a current violation, which there was not, there would still be no warranty claim under 2.5A of the stock purchase agreement. And with that, I'll turn it over to my colleague. Thank you. May it please the Court, my name is Mike Goldfarb. I'm here to address operational control-related issues. In these contracts, the employment agreement and the stock purchase agreement, there are really two deals that the parties made. There's what happens in the first 19 months during the earn-out, and then there's what happens for the rest of the duration of the employment agreement. During the 19-month earn-out period, Mr. Cagliari, the deal that they made was, Mr. Cagliari, as the shareholder's representative, will continue to have operational control of the business as he had before, that the business will be operated as it was in the past, but that that operation will be subject to six limitations, which are for material actions that might affect the situation of the company in the post-earn-out period. The second agreement that kicked in when these operational control provisions burned off, the second agreement between the parties, was simply that Mr. Cagliari would be an executive working at Sargento, like all of the other division presidents. But there is a distinct separation, there are two distinct time periods under these agreements, during the earn-out and after the earn-out, and the deal that the parties made with each other for those two time periods are different. We submit the only way to reasonably read these agreements is to acknowledge and recognize that those two time periods exist, and that there is a difference in those time periods between the rights of the parties. Did the, this was, the jury decided this question, didn't it? Well, Your Honor, the question, yes, is the short answer, the jury did, but this is a question of law in the first instance. Isn't it a question of what operational control means? Well, it is, Your Honor, it's a jury question if you reach the conclusion that it's ambiguous. But it's a judge question in the first instance to look at the second alternative interpretation of the contract that's being offered by Sargento, the one that says that even during the earn-out, Mr. Cagliari is just an employee and that he can be overruled on any issue. It's for the court to look at that second interpretation and decide whether or not it's reasonable. If it's not reasonable, let me back up, to find an ambiguity, there have to be more than one reasonable interpretation of the contract. Isn't there a question in between those of either it's exactly the same or it's, it means nothing? Isn't there, wasn't there, as it was tried to the jury and put to the jury, wasn't there a question of whether this particular act fell within the definition of operational control? I don't think so, Your Honor. What was tried to the jury was the, from Sargento's standpoint, it was their claim that at any time, for any reason, Mr. Cagliari could be overruled because he was, at the end of the day, nothing more than a mere employee of Sargento. And there was no attempt at the trial to parse that issue and say that he had operational control over some things and not others. And that is one of the things that's so striking about Sargento's argument here because taken to its conclusion, what Sargento's saying is that on every issue, at all times, Mr. Cagliari's ultimate authority was simply as a report to Mr. Gentine, and Mr. Gentine could change or overrule his decision on any subject at any time. And so that's how the case went to the jury, Your Honor. So let me turn, if I may, briefly to the contract provisions and start with the stock purchase agreement and suggest to the court that looking on a standalone basis at the stock purchase agreement, that there is no ambiguity within that agreement whatsoever. It says at paragraph 1.6a, the parties agree that prior to the contingent payment due date, which again is this marker before the contingent payment due date and after, portionables will be operated in a manner consistent with past practice under the operational control of Cagliari and subject to the specific agreements to the contrary contained in this section and elsewhere in this agreement. So again, if Mr. Cagliari is simply reporting to Mr. Gentine and can be overruled at any time, then there is no meaning whatsoever that can be attached to this provision. It's just surplusage and it makes the promise of operational control entirely illusory, which again makes that an untenable interpretation of operational control. Even further, the next paragraph lists the specific items that Mr. Cagliari has to seek consent for before he can take action. So 1.6b of the stock purchase agreement says, notwithstanding the understanding concerning control, and they didn't say operational control here, they were even broader, they said control. The company, by the shareholder's representative described above, the parties agree that certain actions which are likely to have a material financial impact on the company after the contingent payment due date will require the consent of the purchaser. These are the material actions. And interestingly, it's the amendment of a material contract. For example, if Mr. Cagliari had wanted to amend the Unilever contract and not the other way around, he would have had to seek consent from Sargento. But this provision 2 absolutely makes no sense if the interpretation of the agreement is that Mr. Cagliari simply works for Mr. Gentine, because then there's no reason to list six things that Mr. Cagliari has to get consent for, because he has to get consent or approval ultimately for everything. And if I can just digress very briefly, the sixth item in that list in 1.6b is a catch-all. And what it says is that if there's going to be anything else that becomes a purchaser consent item, that the parties have to agree to it in writing. Well, if Sargento, as it claims now, has the ultimate authority to decide everything, then why would Mr. Cagliari and Sargento have to agree on things that would be added to the consent list if Sargento already had that right? So the problem in the case is the loose language that's in the employment agreement. And that's what was seized upon by Sargento as it became more and more apparent in discovery that they really had usurped operational control for Mr. Cagliari, which is ultimately not disputed here. So the language in the employment agreement, there is a general statement at the beginning that says that Mr. Cagliari has the duties of a division president and that he's to use his best efforts to perform his duties as assigned by the president and the CEO, which is Mr. Gentine. And if it stopped there, that might be an end to the discussion, but that is not where this provision stops. And so under the Washington Rules of Construction, which say you've got to both read these agreements in full together, but also read the entire agreement, you just simply look at the next clause. So what happens is that general statement that Mr. Cagliari works for Mr. Gentine is modified for the 19-month period during the earn-out. And so what the employment agreement says is, until the contingent payment due date under the purchase agreement, again, there's the timing marker, executive shall serve as the president of Portionables, Inc., and shall have operational control of the Portionables business subject to the limitations in the purchase agreement, not subject to the limitations in the rest of the employment agreement. It refers back to that list of the six things that Mr. Cagliari has to seek consent for. So what's happening here is that a more specific provision in the employment agreement is modifying the general language that comes at the introduction of it. A couple of quick points, I have less than a minute left. This agreement should be read in context. The point here was that this was a $19 million transaction that potentially could grow to a $44 million transaction. And by growing to a $44 million transaction, it would happen because the company reached EBITDA targets. And what the parties agreed to, and Sargento conceded repeatedly at trial, was the purpose of operational control was to protect the earn-out. It makes no sense whatsoever to protect the earn-out by giving Sargento ultimate control to do whatever it wants to, as it ended up doing here with the Unilever contract, which had a $7.8 million potential impact on the ultimate earn-out payment. The last point, and I'll stop if I may, is if these parties represented by sophisticated lawyers intended to do what Sargento says, couldn't they have found a better way to do it than the convoluted language that Sargento tries to cobble together here to do something other than what this agreement says? This agreement was not ambiguous, and court should enforce the true agreement of the parties, which is what's written on the paper. Thank you. Thank you, Jeff. Thank you. I'll try and be brief in the rebuttal of my colleague, Mr. Fisher. If the court believes Sargento invited South Dakota authorities, that's fine. That may be a defense to whether we acted in good faith under the contract or not, but that's not to be decided on summary judgment. Our position is we acted appropriately. The question is whether there was a violation of law at the time. South Dakota said yes. I have to say I'm still skeptical of that claim, meaning under any reasonable construction of that contract, you wanted to know whether they were currently in violation of law, and we learned later when you approach the South Dakota licensing authorities because you want to have a product that has a license, not just a product that no one is objected to, you get them to change their licensing rules so that they now explicitly apply to the product you're making so you can get a license, and then you get them to say, well, I guess, you know, the statute gave us the authority and maybe the control to have this license beforehand, so that's why you get this answer. Well, yeah, I guess it was a violation before, but in any realistic understanding of both the contract and the operation of South Dakota law at the time of signing that contract, there was no violation. I just don't see it. Then there's no reason for you to waste time responding other than to say this. That shouldn't be decided on summary judgment. Our motives, the issue of motive is one of fact, period. It's just one of fact. And if you believe and you're convinced that's the motive, that's fine, but that's not to be decided in summary judgment with due respect. No, in my view it is. They just say that's a reasonable construction of the contract and that's a question of law. The evidence, I think, is described accurately. I mean, when I put your two narratives together, I know what the evidence is. All right. On the issue of the retention bonus, there was no definition offered by the court. Retention means to stay. They read it out of the contract, period. The court itself said that their theory does not hold any water, yet still granted judgment for them. There is no basis for that. I want to go now to the issue of the contract itself first. The jury did decide the question. I disagree with my friend and colleague, Mr. Goldfarb. The jury did decide the question of operational control. Indeed, that was the whole trial. Was Mr. Cagliari deprived of operational control? The jury said unequivocally after three hours, no, he was not. Second point, we never conceded, nor do we concede today that he lost operational control. But truth of the matter is, when I go to motives, what happened was he realized he wasn't going to reach the earn out, and the only way to get the presumption, which was valuable, was to make something up. Indeed, if we look at the contract, the SPA that Mr. Goldfarb pointed to, he says, well, there's six and only six restrictions on Mr. Cagliari's powers. Well, we know that's not true, because if we look at the very next section of the contract, I am now at SCR volume 2, page 16. It says disputed matters. And Mr. Goldfarb said there's two time frames, you know, before the contingent fee date, due date, and after contingent due date. Here's what it says, disputed matters. If a dispute arises related to the operation of the company after closing and prior to the contingent payment due date, they should have a mediation process. Well, how could there be a dispute if there's six issues that are clear? The truth of the matter was that what happened was this. There were six issues that they understood were clearly not within his operational control, and as to everything else, they weren't going to list 5,000 other possibilities that may come up, and what they agreed to was that Mr. Cagliari would be acting as division president to Mr. Gentine. Mr. Gentine told him that, and he said, if you have any questions, if you think I'm wrong, if you think I'm pushing it, come to my door, it's open, we'll work it through, and we have a dispute mechanism here. Not once, not once, between April 30th of 2007 and March 23rd of 2008, did Mr. Cagliari ever claim loss of operational control. Not once. Only when he realized that they weren't going to make the contingent earn out. Oh, my God. The lawyers come in, and we lost operational control. The jury heard the evidence for a week and ruled in our favor. Not only that, there are other limitations in his powers in the agreement. Said differently. Under the agreement, Mr. Cagliari had to run the company in the best long-term interest of the company. Was the issue before the jury, as it was explained by the instructions, by the attorney's arguments? Yes. What? Yeah, I'm sorry, Your Honor. What operational control meant and whether it covered this particular item? That was my closing argument, Your Honor. My closing argument was I took the two provisions, the employment agreement and the SPA, and took the jury through it and explained to the jury that this is what operational control means,  and then I took every letter that was written in correspondence between them from April 30th of 2007, the date of the closing, to March 23rd. Every one. Unilever, Bellingham Cold Storage, every single one of them. Not once was there a claim of loss of operational control. Now, did Cagliari disagree sometimes? Absolutely. But at the end, he acquiesced in what Mr. Gentine's views were. The jury determined that there was no loss of operational control and that operational control meant what we said it meant. Thank you, Your Honor. Thank you, counsel. The case just argued will be submitted. The court will stand in recess for the day. All rise.
judges: Reinhardt, Fletcher W. , Rawlinson